EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Abel Rodríguez Casillas y otros<br><br>Apelados<br><br>v.<br><br>Estado Libreo Asociado de Puerto Rico por conducto del Secretario de Justicia, Hon. César Miranda; Colegio de Técnicos y Mecánicos Automotrices de Puerto Rico, por su Presidente Jorge L. Mejías Agosto<br><br>Apelantes | 2019 TSPR 87<br><br>202 DPR \_\_\_\_ |

Número del Caso: AC-2017-76

Fecha: 8 de mayo de 2019

Tribunal de Apelaciones:

Región Judicial de San Juan – Caguas, Panel IV

Abogados de la parte peticionaria:

Lcdo. Carlos A. Mercado Rivera
Lcdo. José O. Román González

Abogado de la parte recurrida:

Lcdo. Armando Del Valle Muñoz

Oficina del Procurador General:

Lcdo. Luis Román Negrón
Procurador General

Lcdo. Isaías Sánchez Báez
Subprocurador General

Amicus Curie:

Colegio de Tecnólogos Médicos de PR

Lcdo. Henry Freese Souffront
Lcda. Yahaira De la Rosa Alagarín

Consejo Interdisciplinario de Colegio y
Asociaciones Profesionales

Lcdo. Omar E. Martínez Vázquez

<u>Colegio de Técnicos de Refrigeración y Aire Acondicionado de Puerto Rico</u>

Lcdo. Miguel A. Rosario Reyes

<u>Colegio de Ingenieros y Agrimensores de Puerto Rico</u>

Lcdo. Gilberto Oliver Vázquez

Materia: Derecho Constitucional – Declaración de inconstitucionalidad del requisito de  colegiación compulsoria.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Abel Rodríguez Casillas y otros<br><br>    Apelados<br><br>      v.<br><br>Estado Libre Asociado de Puerto Rico por conducto del Secretario de Justicia, Hon. César Miranda; Colegio de Técnicos y Mecánicos Automotrices de Puerto Rico, por su Presidente Jorge L. Mejías Agosto<br><br>    Apelantes | AC-2017-0076 | |

Opinión del Tribunal emitida por la Jueza Asociada señora PABÓN CHARNECO.

En San Juan, Puerto Rico, a 8 de mayo de 2019.

> Hay una básica interdependencia entre la libertad del hombre y la libertad de la ignorancia y la libertad del miedo y la libertad para pensar libremente *y la libertad para* expresarse y *asociarse y reunirse libremente*. Todas estas libertades, en realidad, vienen a constituir la matriz dentro de la cual se desenvuelve a la máxima plenitud la personalidad del hombre. Y dentro de la cual se logra esa esencial dignidad del ser humano […]. Expresiones del delegado Jaime Benítez, 3 Diario de Sesiones de la Convención Constituyente de Puerto Rico 1626 (ed. 2003). (Énfasis suplido).

Como máximos intérpretes de la Constitución de Puerto Rico, hoy tenemos la oportunidad y la gran responsabilidad

de salvaguardar, una vez más, el derecho a la libre asociación contra ataques livianos y caprichosos. Ese derecho no está en nuestra Constitución como mera figura decorativa. *A contrario sensu*, es uno fundamental y está directamente relacionado a la dignidad y a la máxima plenitud de la personalidad del ser humano. Además, su valor es incalculable para mantener la democracia en la sociedad. Por tanto, hoy reafirmamos lo que expresamos en *Rivera Schatz v. ELA y C. Abo. PR II*, 191 DPR 791 (2014), en cuanto a que cuando el Estado pretenda coartar el derecho a asociarse o a no asociarse, debe hacerlo cuando no le quede otra opción para proteger un determinado interés apremiante.

Mediante la Ley Núm. 50 de 30 de junio de 1986, 20 LPRA sec. 2145 *et seq*. (Ley Núm. 50), se pretende restringir la libertad de no asociarse de los técnicos y mecánicos automotrices, pues establece la asociación al Colegio de Técnicos y Mecánicos Automotrices de Puerto Rico como requisito para practicar la profesión. Así, debemos considerar si existen otras alternativas para proteger los intereses que motivaron al Estado a imponer la mencionada restricción. Contestamos en la afirmativa. Por tanto, declaramos contundentemente la inconstitucionalidad de la colegiación compulsoria establecida por la Ley Núm. 50.

A continuación, expondremos en detalle los hechos que dieron génesis a la controversia ante nos.

I

El 27 de febrero de 2015 varios técnicos automotrices[1] (en adelante, técnicos apelados) presentaron una demanda sobre Sentencia Declaratoria en contra del Colegio de Técnicos y Mecánicos Automotrices de Puerto Rico (en adelante, Colegio) y el Gobierno de Puerto Rico (en adelante, Estado). Específicamente, solicitaron que se declarara la inconstitucionalidad del requisito de colegiación compulsoria dispuesto en la Ley Núm. 50. Adujeron que obligarlos a pagar una cuota profesional anual y pertenecer a una organización con la que diferían de sus acciones y expresiones institucionales, so pena de ser suspendidos de la práctica de su oficio y sentenciados con el pago de una multa o pena de reclusión, violaba su derecho a la libertad de asociación, según consagrado en la Constitución de Puerto Rico.

De igual forma, arguyeron que, según lo resuelto en *Rivera Schatz v. ELA y C. Abo. PR II*, supra, el Estado solamente podía interferir con dicho derecho si demostraba la existencia de un interés apremiante y la inexistencia de medidas menos onerosas para proteger ese interés. Así, razonaron que el Estado no había articulado un solo interés

---

[1] La demanda fue presentada originalmente por los señores Abel Rodríguez Casillas, Edgardo Escobar Rodríguez, Carlos López Feris, Aneudi Roa Olmo, Julio Monserrate Santa, Elimanuel Meléndez Medina, José A. Mestre Velázquez, José M. Torres Martínez, Luis Morales Renta, Carlos Negrón Rodríguez, Carlos Babilonia Idelfonso y Rafael Robles Maldonado. Sin embargo, el 9 de octubre de 2015, los últimos cuatro solicitaron el desistimiento voluntario. De conformidad, el 20 de octubre de 2015, el Tribunal de Primera Instancia notificó una Sentencia Parcial mediante la que declaró Con Lugar dicha solicitud y decretó el correspondiente archivo sin perjuicio.

que únicamente se pudiera resguardar con la colegiación compulsoria. Aunque reconocieron que el interés de reglamentar la profesión para la protección del público era de importancia, afirmaron que la Junta Examinadora de Técnicos y Mecánicos Automotrices fue creada precisamente para salvaguardar dicho interés, toda vez que era la facultada, en virtud de la Ley Núm. 40 de 25 de mayo de 1972, 20 LPRA sec. 2131 *et seq.* (Ley Núm. 40), para evaluar y autorizar a los aspirantes a ejercer la profesión mediante la expedición de una licencia, adoptar reglamentos, investigar los incumplimientos con las disposiciones aplicables y suspender la licencia en los casos meritorios. En ese sentido, rechazaron que la colegiación compulsoria fuese necesaria.

Así las cosas, el Estado presentó una *Moción de Desestimación y/o Sentencia Sumaria*. Allí solicitó que se sostuviera la validez constitucional de la colegiación compulsoria, esencialmente, por cuatro (4) fundamentos. Primero, adujo que *Rivera Schatz v. ELA y C. Abo. PR II,* supra, fue resuelto al amparo del poder inherente del Tribunal Supremo para reglamentar la profesión legal, por lo que no era de aplicación al caso ante nos. Segundo, arguyó que quien tenía el poder inherente para reglamentar todas las otras profesiones era la Asamblea Legislativa. Tercero, alegó que el Estado tenía el interés apremiante de reglamentar la profesión, así como de mejorar los servicios ofrecidos al público, y que la ley habilitadora del Colegio

adelantaba esos intereses. Por último, destacó que fueron los propios miembros del Colegio quienes, mediante un referéndum, expresaron su criterio afirmativo respecto a la colegiación.

Posteriormente, el Colegio se unió a la moción presentada por el Estado y adoptó todos sus argumentos.

En respuesta, los técnicos apelados presentaron una réplica, en la que se opusieron a la desestimación solicitada. Además de reiterar sus argumentos, indicaron que el hecho de que se dejara a la voluntad de los miembros decidir si querían o no estar colegiados demostraba la inexistencia de un interés apremiante del Estado. Por otro lado, indicaron que nada de lo argumentado por el Estado justificaba que fueran obligados a asociarse a un Colegio que caracterizaron de la forma siguiente:

> Las posturas oficiales de esta institución distan de ser favorables al desarrollo de la profesión. Conocido es su rol como agente de persecución contra cualquier objetor o disidente en su matrícula, en sus gestiones de cobro de cuotas y en otras instancias. La falta de transparencia en sus estados financieros, el cuestionable uso de fondos y su inexplicable omisión de oponerse a legislación perjudicial a la clase que dice representar, son algunas razones que le restan valor o beneficio tangible a la colegiación compulsoria.[2]

Celebrada una vista argumentativa, el 22 de noviembre de 2016, el Tribunal de Primera Instancia notificó una Sentencia. Razonó que si bien este Tribunal en *Rivera Schatz*

---

[2] Moción en cumplimiento de Orden y Réplica a Solicitud de Desestimación, Apéndice de Recurso de Apelación AC-2017-0076, pág. 31.

*v. ELA y C. Abo. PR II,* supra, invocó su poder inherente para regular la abogacía, su interpretación sobre el derecho fundamental a la libertad de asociación constituía un precedente de aplicación general. A la luz de dicha interpretación, resolvió que debía determinar si la limitación de la libertad a no asociarse contenida en la Ley Núm. 50 superaba el escrutinio constitucional estricto, es decir, si el Estado tenía un interés gubernamental apremiante y si carecía de medidas menos onerosas que la legislada para lograr el interés. Así y tras evaluar los intereses del Estado, según plasmados en la Exposición de Motivos de la mencionada Ley y en el historial legislativo, determinó que, aunque legítimos, no eran suficientes para satisfacer el mencionado escrutinio estricto. De otra parte, destacó que, aunque el Estado alegó tener un interés apremiante en la seguridad pública, este había quedado atendido con la creación de una Junta Examinadora que no solo reglamentaba y otorgaba licencias a los técnicos y mecánicos, sino que además tenía la obligación de fiscalizarlos y la autoridad para revocar sus licencias.

Por todo lo anterior, decretó la inconstitucionalidad de la colegiación compulsoria establecida en la Ley Núm. 50.[3]

Inconforme, el Colegio presentó un oportuno[4] recurso de apelación ante el Tribunal de Apelaciones. Allí, reiteró la

---

[3] Posteriormente, el 21 de diciembre de 2016, el Tribunal de Primera Instancia notificó sendas Resoluciones mediante las que denegó las solicitudes de reconsideración presentadas por el Estado y el Colegio de Técnicos y Mecánicos Automotrices de Puerto Rico.

[4] El Colegio presentó su recurso de apelación el 17 de febrero de 2017.

inaplicabilidad de *Rivera Schatz v. ELA y C. Abo. PR II,* supra, al caso ante nos y el poder de la Asamblea Legislativa de regular y controlar la práctica de las profesiones. Por otro lado, indicó que los colegios profesionales tenían una importante función social respecto a la salud, la seguridad y el bienestar de sus miembros y de la ciudadanía. Específicamente, destacó que el Colegio cumplía a cabalidad con dicha función, toda vez que ofrecía un programa de educación continua con excelentes recursos, proveía asesoramiento a las agencias gubernamentales, procuraba el cumplimiento de estándares de limpieza y calidad, velaba por que las contrataciones de sus miembros fueran éticas y razonables, canalizaba las preocupaciones de dichos miembros y facilitaba un procedimiento cuasi administrativo para el procesamiento de estos. De conformidad, sostuvo que la función del Colegio era de tal importancia que la decisión de la Asamblea Legislativa de mantener la colegiación compulsoria debía declararse válida.

Por su parte, el Estado, representado por la Oficina del Procurador General, presentó un escrito titulado *Comparecencia Especial en Cumplimiento de Orden*. Tras enfatizar el criterio profesional independiente que le asiste al Procurador General, *indicó que el Estado había reevaluado su postura*. Sostuvo que lo dispuesto por este Tribunal en *Rivera Schatz v. ELA y C. Abo. PR II,* supra, sobre el derecho a la libertad de expresión, era un precedente vinculante; que el foro primario había actuado

correctamente al aplicar dicho precedente al caso ante nos; y que se debía tomar en consideración la Opinión de Conformidad emitida por el Juez Asociado señor Martínez Torres en la que concluyó que los principios que se establecieron en *Rivera Schatz v. ELA y C. Abo. PR II,* supra, eran de aplicación general y tenían que evaluarse en el contexto de otras profesiones y oficios. En ese sentido, afirmó que luego de revisar y analizar detenidamente la sentencia del foro primario -a la luz del derecho aplicable y la prueba presentada por las partes- determinó no apelarla.

Así las cosas, el 24 de mayo de 2017, el Tribunal de Apelaciones notificó una Sentencia en la que confirmó el dictamen allí impugnado. Aunque entendió que lo resuelto en *Rivera Schatz v. ELA y C. Abo. PR II*, supra, aplicaba únicamente a los abogados, coincidió con el foro primario en cuanto a que la colegiación compulsoria establecida en la Ley Núm. 50 solo podía ser constitucionalmente válida si el Estado lograba demostrar un interés apremiante y la inexistencia de medidas menos onerosas para alcanzar el interés, lo cual no logró. Destacó que el interés apremiante que articuló el Estado, a saber, la seguridad pública, estaba protegido por la Ley Núm. 40, sin que fuese necesaria la colegiación compulsoria. Posteriormente, mediante una Resolución notificada el 16 de junio de 2017, denegó una Moción de Reconsideración presentada por el Colegio.

Inconforme, el 1 agosto de 2017, el Colegio presentó ante este Tribunal un recurso de apelación, en el que señaló lo siguiente:

> Erraron tanto el Tribunal de Apelaciones como el Tribunal de Primera Instancia, al concluir por fundamentos distintos, que es inconstitucional el requisito de colegiación compulsoria para ejercer la profesión de técnico y mecánico automotriz que establece la Ley Núm. 50 de 30 de junio de 1986.

> Erraron tanto el Tribunal de Apelaciones como el Tribunal de Primera Instancia, al descartar de plano la doctrina de separación de poderes, no respetar la voluntad legislativa e invadir indebidamente prerrogativas delegadas constitucionalmente a dicha Rama de gobierno.

> Erraron tanto el Tribunal de Apelaciones como el Tribunal de Primera Instancia, al no reconocer que el derecho que tiene toda persona a ejercer una profesión o un oficio no es absoluto, sino que está subordinado a los requisitos y las condiciones que razonablemente imponga la Asamblea Legislativa.

El 26 de enero de 2018, emitimos una Resolución en la que acogimos el recurso de apelación. Ello, en virtud del Art. 3.002(b) de la Ley de la Judicatura de 2003, Ley Núm. 201 de 22 de agosto de 2003, según enmendada, 4 LPRA sec. 24s, el cual faculta a este Tribunal para revisar mediante recurso de apelación las sentencias finales en las que el Tribunal de Apelaciones haya determinado la inconstitucionalidad de una ley.

Además, mediante la mencionada Resolución, declaramos con lugar unas solicitudes para comparecer como *amicus curiae* del Colegio de Tecnólogos Médicos de Puerto Rico, el Consejo Interdisciplinario de Colegios y Asociaciones

Profesionales, el Colegio de Médicos Veterinarios de Puerto Rico y el Colegio de Técnicos de Refrigeración y Aire Acondicionado de Puerto Rico. Posteriormente, hicimos lo propio con una similar solicitud del Colegio de Ingenieros y Agrimensores de Puerto Rico.

Por otro lado, el 9 de abril de 2018, compareció el Estado y reiteró "que la interpretación que realizó el foro primario de la cláusula constitucional de libertad de asociación *es esencialmente correcta*, a la luz de los pronunciamientos de este Honorable Tribunal en el caso de *Rivera Schatz*, supra".[5]

Con el beneficio de la comparecencia de las partes y los *amicus curiae*, nos encontramos en posición de resolver la controversia ante nos.

II

A

Toda comunidad políticamente organizada tiene un poder de razón de Estado ("police power"), que es utilizado por la Asamblea Legislativa para prohibir o reglamentar ciertas actividades con el propósito de fomentar o proteger la paz pública, moral, salud y bienestar general de la comunidad. *Domínguez Castro v. E.L.A.*, 178 DPR 1, 36 (2010). En el ejercicio de ese poder, la Asamblea Legislativa tiene la facultad de regular y controlar la práctica de las

---

[5] Véase Comparecencia Especial presentada el 9 de abril de 2018 por el Estado, pág. 22.

profesiones, salvo la jurídica,[6] a fin de proteger la salud y el bienestar público, así como evitar el fraude y la incompetencia. *Accurate Solutions v. Heritage Enviromental*, 193 DPR 423, 434 (2015); *Matos v. Junta Examinadora*, 165 DPR 741, 755 (2005). En cuanto al alcance de dicha facultad, hemos expresado lo siguiente:

> El Estado puede establecer unos requisitos de conocimientos mínimos, capacidad, destreza, entereza moral o cualquier otro que esté racionalmente relacionado con el objetivo de garantizar que los examinados posean la competencia para practicar la profesión en forma adecuada.
>
> El Estado también puede prohibir la práctica de la profesión si no se ha obtenido antes una licencia, permiso o certificado de alguna entidad u oficial examinador. *Col. Ing. Agrim. PR v. AAA*, supra. *De este modo, se ha delegado en las Juntas Examinadoras la tarea de corroborar que un ciudadano posea los conocimientos y las destrezas necesarias para ejercer determinada profesión.* A estos organismos se les ha reconocido una extensa discreción "en la fijación de las normas y procedimientos que han de regir los procesos de admisión o certificación de personas al ejercicio" de profesiones u oficios. *Marcano v. Departamento Estado*, 163 DPR 778, 786 (2005). (Énfasis suplido y citas omitidas).

Ciertamente, "no se discute la extensa discreción del *Estado* y sus juntas examinadoras". *Asoc. Drs. Med. Cui. Salud v. Morales*, 132 DPR 567, 586 (1993). Sin embargo, "no se pueden violar los derechos constitucionales de los aspirantes so pretexto del ejercicio de esa amplia facultad

---

[6] Véase *Rivera Schatz v. ELA y C. Abo. PR II*, 191 DPR 791 (2014) (donde se destacó el poder inherente del Tribunal Supremo para reglamentar la profesión legal).

discrecional". *Torres v. Junta Ingenieros*, 161 DPR 696, 704 (2004). (Énfasis suplido). Véanse también: *Marcano v. Departamento Estado,* supra*; San Miguel Lorenzana v. E.L.A.,* 134 DPR 405, 413-414 (1993).

B

i

En el pasado, este Tribunal ha detallado los beneficios de las Juntas Examinadoras de la siguiente forma:

> "En primer lugar, en la sociedad urbana moderna ... las agencias gubernamentales se responsabilizan de asegurar que las personas encargadas de la salud y el bienestar públicos tengan el conocimiento y la competencia adecuados. Esto sólo puede lograrse definiendo las condiciones de admisión a las ocupaciones y la permanencia en las mismas.
>
> En segundo lugar, la especialización intensa que caracteriza a nuestra compleja sociedad con frecuencia significa que el público podría no distinguir entre los profesionales competentes y no competentes, honestos y deshonestos. *Por lo tanto, las agencias gubernamentales que se encargan de otorgar licencias cumplen una función vital al proteger a la gente del fraude y la deshonestidad.*
>
> En tercer lugar, al licenciar sólo personal competente y bien adiestrado, *las agencias que otorgan licencias pueden proteger la vida y la propiedad....*
>
> En cuarto lugar, las juntas le proveen al ciudadano promedio que cuenta con poco tiempo y dinero, una avenida administrativa rápida, sencilla y económica para resarcirse' de la negligencia profesional, la deshonestidad o la inmoralidad.
>
> En quinto lugar, mediante las penalidades, impuestas por los diferentes estatutos -tales como

la revocación de la licencia- *las agencias que
otorgan licencias podrían obligar a los
profesionales ya licenciados a mantener estándares
altos en su profesión.*

En sexto lugar, las juntas que otorgan licencias
-compuestas por expertos- *están capacitadas para
mantenerse al día con los adelantos científicos y
tecnológicos y asegurarse de que el estándar de
servicios disponibles para las personas está en
armonía con el progreso científico moderno"*.
*Román v. Trib. Exam. de Médicos*, 116 DPR 71, 79
esc. 5 (1985) (citando a J.R.R. II, Note, Due
Process Limitation on Occupational Licensing, 59
Va. L. Rev. 1097, 1098 (1973)) (Énfasis suplido).[7]

En lo pertinente a nuestra controversia, la Ley Núm.
40 de 25 de mayo de 1972, según enmendada, 20 LPRA sec.
2131 *et seq.* (Ley Núm. 40), creó la Junta Examinadora de
Técnicos y Mecánicos Automotrices de Puerto Rico (Junta
Examinadora)[8] con el propósito de reglamentar el oficio
mecánico automotriz. Sobre dicho objetivo, la Exposición de
Motivos de la referida Ley explica lo sucesivo:

La transportación terrestre en nuestra isla, tanto
para fines públicos como privados, depende

---

[7] En el texto al que hace referencia el Tribunal Supremo, que a su vez
cita lo siguiente: *Council of States Governments*, *Occupational Licensing
Legislation in the States*, 3 (1952), se utiliza indistentemente las
palabras "government agencies", "licensing agencies", and "boards", para
refererise a lo mismo, a saber, las entidades que expiden las licencias
profesionales.

[8] Al momento de su aprobación, la Ley Núm. 40 de 25 de mayo de 1972, 20
LPRA sec. 2131 *et seq.* (Ley Núm. 40), solo contemplaba el término global
de Técnico Automotriz para definir aquella persona que se dedicara "a
la realización de labores de reparación y ajuste del motor, transmisión,
y otras partes esenciales para el funcionamiento de un vehículo de motor,
incluyendo el sistema eléctrico del mismo, para las cuales se requieran
destrezas especiales". 20 LPRA sec. 2131 (ed. 1995). En conformidad, la
Junta se denominaba Junta de Técnicos Automotrices de Puerto Rico. Ahora
bien, ello fue enmendado mediante la Ley Núm. 220 de 13 de septiembre
de 1996. Esta incluyó el término de Mecánico Automotriz y renombró la
Junta como la Junta Examinadora de Técnicos y Mecánicos Automotrices de
Puerto Rico. Vale la pena señalar que la diferencia esencial entre un
Técnico Automotriz y un Mecánico Automotriz es la habilidad del primero
para desempeñar sus labores sin supervisión e instruir y supervisar las
labores del segundo.

exclusivamente de los vehículos de motor. Por tal razón, un significativo porcentaje de los recursos gubernamentales se dedican anualmente al mantenimiento y expansión de nuestro sistema de carreteras, al patrullaje policiaco de las mismas y a una intensiva campaña pública dirigida a la prevención de accidentes. Como parte de este esfuerzo, se ha estructurado todo un complejo sistemas de seguros para compensar a las víctimas de accidentes de tránsito, así como un plan para la inspección periódica y obligatoria de todo vehículo de motor, para constatar que están en buenas condiciones mecánicas.

En este plan de inspección periódica toma parte activa un importante grupo de la fuerza laboral; los mecánicos y electromecánicos. En última instancia es en estas personas sobre quienes recae la máxima responsabilidad de examinar y de pasar juicio sobre las condiciones mecánicas de los vehículos de motor y decidir cuáles de ellos no deben transitar por nuestras carreteras, por constituir un riesgo tanto para el conductor como para la seguridad pública en general.

Es pues necesario que se reglamente la práctica del oficio de mecánico y electromecánico y se exijan determinados requisitos de entrenamiento y experiencia para el ejercicio del mismo. *Esta reglamentación del oficio técnico automotriz no sólo es para beneficio del gobierno, la empresa privada y la ciudadanía en general, si [no] también para la protección de los técnicos, como grupo, dentro del conjunto de la fuerza obrera puertorriqueña.* (Énfasis suplido).

En consecución con lo anterior, el Artículo 4 de la Ley Núm. 40, 20 LPRA sec. 2134, otorga a la Junta -compuesta por tres (3) técnicos automotrices, un (1) representante del Secretario del Departamento de Transportación y Obras Públicas y un (1) maestro o funcionario del Departamento de Educación con conocimientos en mecánica y técnica

automotriz[9]- diversos deberes, poderes y facultades. Entre

ellos, se encuentran los siguientes:

> (a) Ofrecer exámenes, por lo menos dos (2) veces al año, para autorizar el ejercicio del oficio de técnico mecánico automotriz y expedir la licencia correspondiente a aquellas personas que cualifiquen para ello de conformidad con lo dispuesto en las secs. 2131 a 2144 de este título.
>
> (b) Adoptar reglas y reglamentos para la implementación de las disposiciones de este capítulo. Dichas reglas y reglamentos tendrán fuerza de ley una vez se hayan promulgado de acuerdo a lo dispuesto en la Ley núm. 112 de 30 de junio de 1957 conocida como "Ley sobre Reglamentos de 1958".
> . . . . . . . . .
> (e) Investigar, a iniciativa propia o por querella formulada por un técnico automotriz o por una persona particular, cualquier violación a las disposiciones de este capítulo o de las reglas y reglamentos adoptados por la Junta. A estos efectos la Junta podrá expedir citaciones requiriendo la comparecencia de testigos y la presentación de los datos e informes que estime pertinentes. […].
> Artículo 4 de la Ley Núm. 40, 20 LPRA sec. 2134.

En cuanto a las licencias, además de expedirlas conforme

a los requisitos dispuestos en los Artículos 5 y 5A de la

Ley Núm. 40, 20 LPRA secs. 2135 y 2135a,[10] la Junta tiene la

facultad para suspenderlas y denegar su renovación.

---

[9] Véase Artículo 2 de la Ley Núm. 40, 20 LPRA sec. 2132.
[10] El Artículo 5 de la Ley Núm. 40, 20 LPRA sec. 2135, establece que la Junta expedirá licencias para ejercer el oficio de técnico automotriz a toda persona que reúna los siguientes requisitos: "(a) Haber cumplido dieciocho (18) años de edad; (b) Tener diploma de cuarto año de escuela superior; (c) Haber obtenido un diploma de una escuela vocacional o de otra institución acreditada o autorizada por el Departamento de Educación de Puerto Rico o por el Consejo de Educación de la Universidad de Puerto Rico, acreditativo de que el solicitante ha cursado y aprobado un curso de por lo menos dos (2) años de duración en mecánica o electromecánica de vehículos de motor […] o un curso de mil doscientas (1,200) horas de mecánica en general o electromecánica de vehículos de motor, que lo cualifican para ejercer el oficio de técnico automotriz o en su efecto, haber terminado el curso de adiestramiento prescrito […] por el Consejo de Aprendizaje de Puerto Rico […]; (d) Gozar de buena conducta, que será acreditada mediante el certificado oficial que expida la Policía de

Específicamente, el Artículo 7 de la Ley Núm. 40, 20 LPRA sec. 2137, dispone que la Junta podrá suspender, por un término no mayor de un (1) año, una licencia a todo técnico automotriz que: (a) haya sido convicto de delito grave o de delito menos grave que implique depravación moral; (b) haya tratado de ayudar a otro a obtener una licencia mediante fraude o engaño; o (c) haya incurrido en incompetencia manifiesta en el ejercicio, en perjuicio de tercero.

Por otro lado, el Artículo 8 del estatuto, 20 LPRA sec. 2138, establece que la Junta no podrá renovar ninguna licencia, a menos que su tenedor acredite, *inter alia*, haber aprobado estudios continuados por medio de adiestramiento o seminarios para mejorarse en la práctica de su oficio por un período no menor de cincuenta (50) horas durante el tiempo de vigencia de su licencia.

En virtud de su poder de adopción de reglamentos para la implantación de las disposiciones de la Ley Núm. 40, incluyendo el mencionado Artículo 8, *supra*, la Junta promulgó el *Reglamento para la Educación Continuada Compulsoria de los Técnicos y Mecánicos Automotrices*,

---

Puerto Rico […]; (e) Haber aprobado los exámenes que ofrezca la Junta, y (f) Haber pagado los derechos de examen y licencia […]". Por su parte, el Artículo 5A de la misma ley, 20 LPRA sec. 2135a, dispone que la Junta expedirá licencia para ejercer el oficio de mecánico automotriz a toda persona que cumpla con los siguientes requisitos: "(a) Haber cumplido 16 años de edad; (b) Poseer diploma de escuela intermedia; (c) Haber aprobado un curso de mecánica general de automóviles de por lo menos seis (6) meses o seiscientas (600) horas en una escuela vocacional o en una escuela reconocida por el Consejo de Educación o en su defecto haber terminado el curso de adiestramiento prescrito por éste; (d) Haber aprobado el examen de mecánico autorizado por la Junta; [y] (e) Haber pagado los derechos de examen y licencia".

Reglamento Núm. 7130 de 4 de abril de 2006. Allí, con el propósito de "lograr la excelencia en los programas de educación continuada" y de "mantener o incrementar la capacitación profesional del Técnico y Mecánico Automotriz", la Junta estableció, entre otros asuntos, las reglas en cuanto al tipo de educación que deben recibir los técnicos y mecánicos, según su especialidad, las normas que deben seguir los desarrolladores de los cursos para garantizar la adecuación de estos, y las cualificaciones de los instructores.

ii

Por otro lado, mediante la aprobación de la Ley Núm. 50 de 30 de junio de 1986, 20 LPRA sec. 2145 *et seq.* (Ley Núm. 50), la Asamblea Legislativa autorizó la creación del Colegio de Técnicos y Mecánicos Automotrices. Específicamente, el Artículo 2 de la Ley Núm. 50, 20 LPRA sec. 2145a, estableció lo siguiente:

> Se autoriza a los técnicos y mecánicos automotrices debidamente licenciados por la Junta Examinadora de Técnicos Automotrices, siempre que la mayoría de éstos así lo acuerden en referéndum que al efecto se celebrará según se dispone más adelante, a constituirse en una entidad jurídica o corporación cuasi pública bajo el nombre de Colegio de Técnicos y Mecánicos Automotrices de Puerto Rico.

El propósito de dicha entidad quedó plasmado en la Exposición de Motivos de la Ley:

> Mediante la aprobación de la Ley Núm. 40 del 25 de mayo de 1972, según enmendada, se exigió la reglamentación del oficio de técnico automotriz y mecánico de automóviles. Cumpliendo con este requisito se estableció la Junta Examinadora de

Técnicos Automotrices que ha certificado a miles de personas en el transcurso de los últimos años.

*Tomando en consideración el crecido número de técnicos automotrices* se hace necesaria la creación de un colegio que les permita a éstos canalizar efectivamente sus esfuerzos colectivos que van encaminados a dar un mejor servicio a la comunidad y que contribuyen al adelanto del progreso de Puerto Rico.

Por las razones antes expuestas, esta Asamblea Legislativa considera que *para beneficio y protección tanto de los técnicos automotrices y mecánicos de automóviles como el público en general* es de rigor que se establezca debidamente el Colegio de Técnicos y Mecánicos Automotrices de Puerto Rico. (Énfasis suplido).

En ese sentido, el Colegio fue facultado, en lo pertinente, para lo siguiente:

(f) Adoptar y velar por que se cumplan los cánones de ética que regirán la conducta de los técnicos y mecánicos automotrices […].

(g) Recibir e investigar las querellas que bajo juramento se formulen respecto a la conducta de sus miembros en el ejercicio del oficio y a las violaciones a este capítulo, pudiendo remitirlas a la Directiva del Colegio para que actúe y después de una vista preliminar en la que se permita al interesado o a su representante legal a traer sus testigos y ser oído, *si encontrara causa fundada, instituir la querella correspondiente ante la Junta Examinadora de Técnicos Automotrices*. Nada de lo dispuesto en este inciso se entenderá en el sentido de limitar o alterar la facultad de la Junta Examinadora de Técnicos Automotrices para iniciar por su propia cuenta estos procedimientos.

(h) Proteger a sus miembros en el ejercicio del oficio y socorrer aquellos que se retiren por inhabilidad física o edad avanzada mediante la creación de un fondo de beneficencia que además proporcionará ayuda a los herederos de los que

fallezcan. Artículo 3 de la Ley Núm. 50, 20 LPRA sec. 2145b. (Énfasis suplido).

De igual forma, se le otorgaron los siguientes deberes y obligaciones:

(1) Contribuir al adelanto y desarrollo de la tecnología automotriz.

(2) Promover relaciones fraternales entre sus miembros.

(3) Cooperar con todo aquello que sea de interés mutuo y de provecho al bienestar general.

(4) Establecer relaciones con asociaciones análogas de otros países, dentro de determinadas reglas de solidaridad y cortesía.

(5) Mantener una moral saludable y estricta entre los asociados.

(6) Elevar y mantener la dignidad del oficio y sus miembros, velar por que sus miembros observen una excelente conducta ética y establecer programas o cursos de educación o estudios continuos.

(7) Proveer el asesoramiento e información que requiera la gestión gubernamental. Artículo 12 de la Ley Núm. 50, 20 LPRA sec. 2145k. (Énfasis suplido).

Además de todo lo anterior, al Colegio se le concedió la autoridad para asumir la representación de todos los colegiados y hablar en su nombre, de acuerdo con los términos de la Ley Núm. 50, *supra*, del Reglamento del Colegio y de las decisiones adoptadas por los colegiados en las asambleas. Artículo 16 de la Ley Núm. 50, 20 LPRA sec. 2145l.

En cuanto a su membresía, y según adelantado previamente, se dispuso que fuese compulsoria.

Específicamente, los Artículos 4, 9, 10 y 17 de la Ley Núm. 50, 20 LPRA secs. 2145c, 2145h, 2145i y 2145m, establecen que todos los técnicos y mecánicos automotrices serán miembros del Colegio; que todos deben pagar una cuota anual; que cualquier miembro que no pague su cuota quedará suspendido; y que cualquiera que se dedique a la práctica del oficio de técnico o mecánico automotriz sin estar debidamente colegiado *incurrirá en delito menos grave* y será sentenciado con una multa no menor de veinticinco dólares ($25.00) ni mayor de doscientos dólares ($200.00) o con una pena de reclusión por un término no menor de un (1) mes ni mayor de dos (2) meses.

En conformidad con lo estatuido, posteriormente se enmendó la Ley Núm. 40, *supra*, para condicionar la expedición y renovación de las licencias de técnico y mecánico automotriz a la debida colegiación. Véanse: Artículo 8 de la Ley Núm. 40, 20 LPRA secs. 2138 y Artículo 2 de la Ley Núm. 78 de 23 de septiembre de 1992, 20 LPRA sec. 2144b.

C

Dado que la colegiación compulsoria de una clase profesional crea una fricción inevitable con el derecho a la libertad de asociación de los afectados,[11] es necesario discutir la naturaleza y los linderos de ese derecho, *según quedó consagrado de forma específica en la Constitución de Puerto Rico.*

---

[11] *Col. Abogados v. ELA*, 181 DPR 135, 137 (2011) (Resolución).

A diferencia de la Constitución de Estados Unidos, nuestra Carta Magna dispone que "las personas podrán asociarse y organizarse libremente para cualquier fin lícito, salvo en organizaciones militares o cuasi militares". Art. II, Sec. 6, Const. PR, LPRA, Tomo 1, ed. 2008, pág. 294.

Esta disposición fue evaluada e interpretada por este Tribunal en *Rivera Schatz v. ELA y C. Abo. PR II*, supra. Allí, decretamos la inconstitucionalidad de la colegiación compulsoria de los abogados y aunque para ello nos basamos principalmente en nuestro Poder Inherente para regular la profesión legal, también consideramos las repercusiones de la mencionada colegiación en el derecho a la libre asociación de los abogados. Debido a que dicho derecho no solo lo ostentan los abogados -sino todos los ciudadanos de este territorio-, su discusión en *Rivera Schatz v. ELA y C. Abo. PR II*, supra, constituye un precedente de aplicación general en esta jurisdicción.

En *Rivera Schatz v. ELA y C. Abo. PR II*, supra, tras un análisis concienzudo de aquellos factores que inspiraron la redacción de la sección 6 del Artículo 2 de nuestra Constitución, resaltamos que la intención de los constituyentes era reconocer un derecho de preminencia, distinto y de mayor amplitud que el reconocido bajo la Constitución de Estados Unidos. *Id*. pág. 811. En apoyo de ello, hicimos referencia a las expresiones del delegado Jaime Benítez al presentar el Informe de la Comisión de la

Carta de Derechos a la Convención, a saber, que "'[el derecho de asociación propuesto] pasa a incorporar un nuevo aspecto del derecho y de la libertad […] que no aparece tradicionalmente en las constituciones clásicas'". *Id.*[12] También, destacamos que se insistió en hacerlo constar en la Constitución, por entender que "*la garantía de ese derecho era un principio fundamental de la libertad humana, y por lo tanto inherente a la democracia*". *Id.*, pág. 810.[13] (Énfasis suplido).

Por otro lado, reconocimos que los constituyentes tenían claro que el derecho a la libre asociación necesariamente *presuponía el derecho de las personas a no asociarse. Id.* págs. 811-812. Ello, debido a que la Declaración Universal de Derechos Humanos de las Naciones Unidas fue eje de inspiración en la redacción de nuestra Carta de Derechos y esta dispone que "[n]*adie podrá ser obligado a pertenecer a una asociación". Id.* pág. 811.[14] De igual forma, aludimos a que en *Colegio de Abogados de P.R. v. Schneider*, 112 DPR 540, 549 (1982), ya este Tribunal había reconocido que "[e]l derecho a la no asociación [es]

---

[12] Véase *Rivera Schatz v. ELA y C. Abo. PR II*, supra, pág. 811 (haciendo referencia a: 2 Diario de Sesiones de la Convención Constituyente de Puerto Rico 1104 (2003)).

[13] Véase *Rivera Schatz v. ELA y C. Abo. PR II*, 191 DPR 791, 810-811 (2014) (haciendo referencia a: Escuela de Administración Pública de la Universidad de Puerto Rico, *La nueva Constitución de Puerto Rico*, Río Piedras, EDUPR, 1954, págs. 224-225).

[14] Véase *Rivera Schatz v. ELA y C. Abo. PR II*, supra, pág. 811 (haciendo referencia a: J.J. Álvarez González, *Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos*, Bogotá, Ed. Temis, 2009, pág. 11 y al Artículo 20 de la Declaración Universal de Derechos Humanos).

derivable del derecho contrario consagrado en la Constitución del Estado Libre Asociado, Art. II, Sec. 6". *Id.*, págs. 812-813.

Por último, y de esencial importancia, recalcamos que cuando el Estado interfiere con el derecho fundamental a la libre asociación, deberá superar un escrutinio constitucional estricto y demostrar que existe un interés apremiante que hace *necesaria* su actuación. *Id.*, pág. 813.[15] Es decir, que además de articular la existencia de un interés apremiante, será imprescindible que el Estado pruebe que *no tenía a su alcance medidas menos onerosas* que la legislada para lograr el interés articulado. *Id.*[16] Véase también, *Rodríguez v. Srio. de Instrucción*, 109 DPR 251, 255 (1979) ("el derecho de las personas a asociarse […] [es fundamental] para la consecución y ejercicio de la libertad de conciencia lo que nos obliga a su más celosa protección").

III

Como cuestión de umbral, atendemos dos (2) planteamientos presentados por el Colegio y los *amicus curiae*, que inciden en nuestra facultad para revisar la controversia ante nos y el derecho aplicable para atenderla.

---

[15] Véase *Rivera Schatz v. ELA y C. Abo. PR II*, supra, pág. 813 (haciendo referencia a: Álvarez González, *op. cit.*, pág. 816 y a *Col. Abogados v. E.L.A.,* supra, pág. 117).

[16] Véase *Rivera Schatz v. ELA y C. Abo. PR II,* supra, pág. 813 (haciendo referencia a: *UPR v. Laborde Torres y otros I*, 180 DPR 253, 289 (2010); *Pérez, Román v. Proc. Esp. Rel. de Fam.*, 148 DPR 201, 214 (1999); *De Paz Lisk v. Aponte Roque*, 124 DPR 472, 489 (1989); *Arroyo v. Rattan Specialties, Inc.*, 117 DPR 35, 63 (1986) y *Com. de la Mujer v. Srio. de Justicia*, 109 DPR 715, 733 (1980)).

Primero, sugieren que, en virtud de la Doctrina de Separación de Poderes, este Tribunal no puede interferir con el poder inherente de la Asamblea Legislativa para regular y controlar la práctica de las profesiones. No tienen razón.

Ciertamente, la finalidad de la Doctrina de Separación de Poderes "es mantener la colaboración entre las tres (3) ramas de gobierno, sin que una domine o interfiera indebidamente con la otra". *Díaz Carrasquillo v. García Padilla*, 191 DPR 97, 110 (2014). Ahora bien, "en el desempeño normal de nuestras funciones revisoras bajo el sistema de separación de poderes, los tribunales debemos actuar con prudencia y deferencia a la voluntad legislativa, *siempre que la misma esté enmarcada dentro del esquema constitucional*". PIP v. CEE, 120 DPR 580, 611 (1988). (Énfasis suplido). Por tanto, y como máximos intérpretes de la Constitución, tenemos la indelegable obligación de velar que la Asamblea Legislativa, en el ejercicio de su poder para reglamentar las profesiones, no viole los derechos constitucionales de los profesionales.

Por otro lado, tanto el Colegio como los *amicus curiae*, plantean que *Rivera Schatz v. ELA y C. Abo. PR II*, supra, no es aplicable al caso ante nos, pues fue resuelto al amparo del Poder Inherente de este Tribunal para regular la profesión legal. Según adelantamos, este Tribunal en dicho caso también discutió el derecho de libre asociación de los abogados y resolvió que la colegiación compulsoria allí impugnada violaba dicho derecho. En ese sentido, resolvemos

que esa discusión aplica a todos los profesionales, incluso a los que están ante nuestra consideración. Lo contrario, sería concluir que los demás profesionales tienen menos derechos que los abogados frente al Estado. Ello es improcedente.

Establecido lo anterior, pasamos a resolver la controversia ante nuestra consideración, la cual se reduce a determinar si el Estado ha articulado un interés apremiante que hace necesario obligar a los técnicos y mecánicos automotrices a asociarse al Colegio como condición para ejercer su profesión. Contestamos en la negativa.

En la Exposición de Motivos de la Ley Núm. 50 la Asamblea Legislativa dispuso que debido "al crecido número de Técnicos Automotrices se hace necesario la creación de un Colegio". El aumento de técnicos automotrices en Puerto Rico no constituye de ninguna manera un interés apremiante para propósitos de la cláusula objeto de estudio. Ahora bien, en la misma Exposición, el Estado también articuló que el Colegio era necesario "para beneficio y protección tanto de los Técnicos Automotrices y Mecánicos de Automóviles como el público en general". Ciertamente, la protección de los técnicos y mecánicos automotrices, así como la seguridad pública son intereses apremiantes. No obstante, para salvaguardar dichos intereses no es necesaria la limitación al derecho de asociación de los técnicos y mecánicos. Existen medidas menos onerosas para protegerlos.

Precisamente, para "la protección de los técnicos como grupo"[17] y el "beneficio del gobierno, la empresa privada y la ciudadanía en general",[18] se creó la Junta Examinadora de Técnicos y Mecánicos Automotrices. En virtud de la Ley Núm. 40, la Junta está facultada para ofrecer exámenes, expedir, suspender y revocar las licencias de técnico y mecánico automotriz, adoptar reglamentos para la implementación de la Ley Núm. 40 e investigar a los técnicos y mecánicos por violaciones a la Ley Núm. 40 y los reglamentos expedidos por la Junta. Así también, en virtud de su facultad para adoptar reglamentos, promulga reglas para asegurar la calidad de la educación continuada obligatoria.

Es mediante *el buen ejercicio de las facultades delegadas a la Junta* y no a través de la colegiación compulsoria que se logra mantener estándares altos en la profesión, lo que beneficia a los profesionales como grupo y a la ciudadanía en general. No hace falta la colegiación compulsoria para elevar dichos estándares. En el caso de que necesiten mejorarse, lo que resultaría necesario sería modificar y corregir los requisitos para ingresar y mantenerse en la profesión. En ese sentido, la Junta podría aumentar la rigurosidad de los exámenes y la educación continuada, ser más afectiva en la investigación de las querellas en contra de los profesionales y ser mucho más implacable en la suspensión y revocación de licencias cuando

---

[17] Véase Exposición de Motivos de la Ley Núm. 40, supra.
[18] *Id.*

las circunstancias lo ameriten. Véase en el contexto de la profesión jurídica, *Rivera Schatz v. ELA y C. Abo. PR II*, supra, págs. 819-820. En fin, la excelencia de la profesión no tiene y no debe estar sujeta al menoscabo del derecho de asociación de los profesionales que constituye la colegiación obligada.

Ahora bien, el Colegio insiste en su permanencia, pues entiende que "cumple una importante función social en cuanto a la seguridad y bienestar de los ciudadanos que circulan en vehículos de motor por nuestras carreteras [así como que] es la entidad que está a cargo de proveer adiestramientos actualizados a los profesionales".[19]

Sin embargo, lo que hoy resolvemos no incide sobre la facultad de la Asamblea Legislativa de crear colegios o asociaciones, con matrícula voluntaria. En ese sentido, nada impide que el Colegio permanezca con una colegiación voluntaria y ayude a proteger a los profesionales y a la ciudadanía en general. De hecho, todos los deberes y obligaciones que se le otorgaron, en virtud de la Ley Núm. 50, para salvaguardar dichos intereses pueden lograrse sin tener que imponer una colegiación compulsoria.

Así, el Colegio puede proponer unos Cánones de Ética para la aprobación de la Junta. De igual forma, puede investigar y reportar violaciones éticas o de otra índole por parte de sus miembros; proteger a sus miembros en el ejercicio del oficio; socorrer aquellos que se retiren por

---

[19] Véase Recurso de Apelación, págs. 21-22.

inhabilidad física o edad avanzada mediante la creación de un fondo de beneficencia; contribuir al adelanto y desarrollo de la tecnología automotriz; promover relaciones fraternales entre sus miembros; cooperar con todo aquello que sea de interés mutuo y de provecho al bienestar general; establecer relaciones con asociaciones análogas de otros países; mantener una moral saludable y estricta entre sus miembros; elevar y mantener la dignidad del oficio; establecer programas o cursos de educación o estudios continuos; y proveer el asesoramiento e información que requiera la gestión gubernamental. Véanse: Artículos 3 y 12 de la Ley Núm. 50, *supra*.

En vez de ser perjudicial para la profesión, el hecho de que la colegiación sea voluntaria promoverá que el Colegio ejerza los mencionados deberes con excelencia, pues solo de esa forma logrará que los profesionales quieran pertenecer a este.

Por último, varios de los *amicus curiae* fundamentan la procedencia de la colegiación compulsoria en varias opiniones emitidas por el Tribunal Supremo de Estados Unidos. Por ejemplo, hacen referencia a *Abood v. Detroit Bd. of Ed.*, 431 US 209 (1977), el cual fue revocado, y discuten que en dicho caso el Tribunal Supremo Federal determinó que era constitucionalmente válido el que una unión cobrara un cargo por servicio a unos empleados no unionados que expresaron estar en desacuerdo con las posturas de la unión, siempre que dichos cargos no fueran utilizados para

financiar la expresión de ideas políticas no relacionadas con el deber de representar a los empleados en la negociación colectiva.  De igual forma, hacen referencia a *Keller v. State Bar of California*, 496 US 1 (1990) y argumentan que allí, el Tribunal, al aplicar el análisis de *Abood v. Detroit Bd. of Ed.*, supra, resolvió que un colegio de abogados puede constitucionalmente financiar actividades germanas a los intereses del Colegio de regular la profesión legal y la calidad de servicios legales.

Ahora bien, mencionamos que el Tribunal Supremo Federal emitió recientemente una Opinión en el caso *Janus v. American Federation of State, County, and Mun. Employees, Council 31*, 138 S.Ct. 2448 (2018), que podría ser indicativa de un nuevo enfoque en cuanto al derecho constitucional a la libre asociación en la Nación. Allí, el Tribunal revocó a *Abood v. Detroit Bd. of Ed.*, 431 US 209 (1977) y decretó la inconstitucionalidad de unos cargos impuestos por una unión a unos empleados no unionados que expresaron estar en desacuerdo con las posturas de la unión. Al hacerlo, expresó lo siguiente:

> Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command, and in most contexts, any such effort would be universally condemned.
>
> .     .     .     .     .     .     .
>
> When speech is compelled, however, additional damage is done. In that situation, individuals are coerced into betraying their convictions. Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning, and for this reason, one of our landmark free speech cases said that a law commanding "involuntary

affirmation" of objected-to beliefs would require "even more immediate and urgent grounds" than a law demanding silence. […].

Compelling a person to subsidize the speech of other private speakers raises similar First Amendment concerns. As Jefferson famously put it, "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves and abhor[s] is sinful and tyrannical." A Bill for Establishing Religious Freedom, in 2 Papers of Thomas Jefferson 545 (J. Boyd ed. 1950) (emphasis deleted and footnote omitted). We have therefore recognized that a "'significant impingement on First Amendment rights'" occurs when public employees are required to provide financial support for a union that "takes many positions during collective bargaining that have powerful political and civic consequences." Knox, supra, at 310–311, 132 S.Ct. 2277 […].

Because the compelled subsidization of private speech seriously impinges on First Amendment rights, it cannot be casually allowed. (Citas omitidas).

Ese razonamiento es similar al que empleamos en esta Opinión al amparo de la Constitución de Puerto Rico. Sin embargo, no es necesario resolver la aplicabilidad de la doctrina federal. Es importante recalcar que la decisión a la que hoy llegamos está basada en la Constitución de Puerto Rico y resolvemos por fundamentos locales adecuados e independientes al derecho constitucional federal de libertad de asociación. Véanse: *Michigan v. Long*, 463 US 1032 (1983); *Rivera Schatz v. ELA y C. Abo. PR II*, supra, pág. 809.

IV

Por los fundamentos expuestos, se confirman las Sentencias de los foros recurridos y se decreta la inconstitucionalidad de la colegiación compulsoria establecida por los Artículos 4 y 17 de la Ley Núm. 50,

*supra*, así como por los Artículos 2 y 8 de la Ley Núm. 40, según enmendada, *supra*, y el Artículo 2 de la Ley Núm. 78 de 23 de septiembre de 1992, *supra*.

Se dictará Sentencia de Conformidad.


                              Mildred G. Pabón Charneco
                              Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Abel Rodríguez Casillas y otros<br><br>    Apelados<br><br>        v.<br><br>Estado Libre Asociado de Puerto Rico por conducto del Secretario de Justicia, Hon. César Miranda; Colegio de Técnicos y Mecánicos Automotrices de Puerto Rico, por su Presidente Jorge L. Mejías Agosto<br><br>    Apelantes | AC-2017-0076 |

SENTENCIA

En San Juan, Puerto Rico a 8 de mayo de 2019.

Por los fundamentos expuestos, se confirman las Sentencias de los foros recurridos y se decreta la inconstitucionalidad de la colegiación compulsoria establecida por los Artículos 4 y 17 de la Ley Núm. 50, *supra*, así como por los Artículos 2 y 8 de la Ley Núm. 40, según enmendada, *supra*, y el Artículo 2 de la Ley Núm. 78 de 23 de septiembre de 1992, *supra*.

Lo acordó y manda el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Rivera García emitió una Opinión de Conformidad. El Juez Asociado señor Estrella Martínez concurre con la siguiente expresión:

> La regulación de las diversas profesiones es un asunto que no puede tratarse homogéneamente. A modo de ejemplo, en *Rivera Schatz v. ELA y C. Abo. PR II*, 191 DPR 791 (2014), protegí con firmeza el poder inherente de este Tribunal para regular la profesión de la abogacía. Bastaba con ese fundamento para invalidar la legislación impugnada y disponer de la controversia ante nuestra consideración. Hoy, debemos dirimir si ha llegado el momento adecuado para abordar una discusión sobre el derecho a la libre asociación y examinar los estatutos aquí impugnados conforme al rigor y

los parámetros adjudicativos exigidos bajo esta garantía constitucional. Para contestar la interrogante, resulta de trascendental importancia considerar no tan solo los planteamientos constitucionales promovidos por las partes, sino también los incidentes fácticos y procesales que revisten la controversia.

En la controversia ante nos, no existe necesidad jurídica de llevar a cabo todo el análisis exigido bajo el escrutinio estricto dado que, a lo largo de todo el trámite apelativo, el propio Estado -quien viene llamado a ejecutar y defender la legislación impugnada- se ha allanado y defendido expresamente el decreto de inconstitucionalidad emitido por los foros inferiores. Aún conscientes de lo anterior, una Mayoría de este Tribunal optó por aferrarse en escrutar los estatutos impugnados en este caso para así consignar una serie de conclusiones vinculantes que, según visto, resultan innecesarias y, más preocupante aún, pretenden articular una norma que excede la controversia bajo nuestra consideración.

Sobre esto último, estimo necesario enfatizar que el esquema de colegiación compulsoria invalidado en **este caso particular** no necesariamente corresponde a la realidad de las profesiones restantes en Puerto Rico. Es por ello que tampoco puedo avalar pautar mediante una Opinión, que vincule a esas otras profesiones, el que la Asamblea Legislativa solamente pueda crear colegios o asociaciones con matrícula voluntaria. Tampoco puedo estar de acuerdo en limitar tajantemente a la Asamblea Legislativa a utilizar exclusivamente el mecanismo de una Junta Examinadora y restringir innecesariamente el uso de otros modelos regulatorios. En ese sentido y tomando en cuenta la multiplicidad de colegios profesionales establecidos por virtud de ley, a los que se les ha dotado de diversos poderes y facultades, el desenlace en cada caso debió depender de sus propias circunstancias. Es decir, lo hoy resuelto por este Tribunal no debió convertirse en una norma de aplicación general que vete de antemano la facultad del Estado de regular y controlar el ejercicio de algunas profesiones mediante la institución de un esquema de colegiación compulsoria para las mismas, siempre y cuando el interés público, la seguridad y la protección de la ciudadanía así lo requiera y ello cumpla con los parámetros constitucionales aplicables.

El Juez Colón Pérez emitió una Opinión Disidente.  La Juez Asociada señora Rodríguez Rodríguez disiente por los mismos fundamentos expresados en la Opinión disidente de la Jueza Presidenta Oronoz Rodríguez en *Rivera Schatz v. ELA*, 191 DPR 791 (2014).  La Jueza Presidenta Oronoz Rodríguez disiente.


                          José Ignacio Campos Pérez
                          Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Abel Rodríguez Casillas y otros<br><br>Apelados<br><br>v.<br><br>Estado Libre Asociado de Puerto Rico por conducto del Secretario de Justicia, Hon. César Miranda; Colegio de Técnicos Automotrices de PR, por su Presidente Jorge L. Mejías Agosto<br><br>Apelantes | AC-2017-0076 | |

**Opinión de Conformidad emitida por el Juez Asociado señor RIVERA GARCÍA.**

En San Juan, Puerto Rico, a 8 de mayo de 2019.

> *A constitution is, in fact, and must be regarded by the judges, as a fundamental law. It therefore belongs to them to ascertain its meaning, as well as the meaning of any particular act proceeding from the legislative body. If there should happen to be an irreconcilable variance between the two, that which has the superior obligation and validity ought, of course, to be preferred; or, in other words, the Constitution ought to be preferred to the statute, the intention of the people to the intention of their agents. Nor does this conclusion by any means suppose a superiority of the judicial to the legislative power. It only supposes that the power of the people is superior to both; and that where the will of the legislature, declared in its statutes, stands in opposition to that of the people, declared in the Constitution, the judges ought to be governed by the latter rather than the former. They ought to regulate their decisions by the fundamental laws, rather than by those which are not fundamental.* The Federalist No. 78 (Alexander Hamilton).

Sin lugar a dudas, interpretar los derechos y las libertades fundamentales de los ciudadanos y las ciudadanas es uno de los cometidos más importantes que tenemos como

juzgadores y juzgadoras. Ello impone en nuestros hombros una gran responsabilidad. Es por esto que el descargo de esta faena, principalmente en Puerto Rico y dado a nuestra relación con Estados Unidos, amerita de cada uno de los componentes de este Tribunal un estudio celoso e independiente de cada caso. No es para menos. Tras desempeñar esta función, luego de una evaluación del elemento central de esta polémica ──entiéndase la libertad de asociación── por ser mi criterio que el derecho reclamado está cobijado por la garantía fundamental que ofrece la Primera Enmienda de la Constitución de la Unión Americana, estoy conteste con el desenlace al que llegó una mayoría de mis compañeros y compañeras.

I

No es necesario abordar los pormenores procesales de este caso pues ya se encuentran sintetizados en la opinión del Tribunal. Me circunscribiré a acentuar que varios técnicos automotrices (técnicos automotrices o apelados) demandaron al Gobierno de Puerto Rico y al Colegio de Técnicos y Mecánicos Automotrices de Puerto Rico (CTMAPR o apelante), con el propósito de objetar la constitucionalidad de la Ley Núm. 50 de 30 de junio de 1986, *Ley para Crear el Colegio de Técnicos y Mecánicos Automotrices*, 20 LPRA sec. 2145 *et seq.* Esto, en cuanto al "requisito de [la] colegiación compulsoria de todos los técnicos y mecánicos automotrices debidamente licenciados", y apoyándose en la libertad de asociación.

Luego de justipreciar los planteamientos de todas las partes, el foro primario dictó una sentencia en la que decretó la inconstitucionalidad del estatuto. No conteste con el curso decisorio, el apelante incoó un recurso de apelación. En esa ocasión, el Estado, por conducto del Procurador General, instó una *Comparecencia especial en cumplimiento de orden* en la que afirmó que

> [a]un cuando reconocemos que en el presente caso ante el foro inferior se postuló distinguir lo resuelto en el caso de Rivera Schatz v. E.L.A., supra, **al amparo del criterio profesional independiente que le asiste al Procurador General sobre los asuntos ante su atención, se ha reevaluado la postura del Estado sobre el particular**, ello basado en un minucioso y objetivo análisis de los pronunciamientos de nuestro más Alto Foro en el referido caso de Rivera Schatz. Así pues, reconoce que la Opinión y Sentencia emitida por nuestro Tribunal Supremo en el caso de Rivera Schatz v. E.L.A., supra, se desprende que el Tribunal Supremo resolvió que la actuación de la Asamblea Legislativa de, en virtud de la aprobación de la Ley Núm. 109-2014, reinstalar nuevamente la colegiación obligatoria como requisito para que los miembros de la clase togada puedan ejercer válidamente la profesión legal en Puerto Rico, no tan solo es incompatible con el poder inherente de la Rama Judicial de reglamentar la abogacía de Puerto Rico, **sino que es contraria al derecho a la libertad de asociación consagrado explícitamente en el Art. II, Sec. 6 de nuestra Constitución.** (Subrayado en el original y énfasis suplido).[1]

A pesar de esta aseveración gubernamental, el foro apelativo intermedio emitió una sentencia en la que confirmó el dictamen recurrido, aunque por otros fundamentos. En particular, entendió que "**el CTMAPR** no demostró que el requisito de colegiación compulsoria, como condición para la

---

[1] Comparecencia especial en cumplimiento de orden, *Índice del apéndice*, pág. 220.

práctica del oficio de técnico automotriz, adelantara el interés articulado". (Énfasis suplido).[2] Aún insatisfecho, el apelante acudió ante nos con la presentación de un recurso de apelación. Nuevamente, el Estado compareció y avaló la invalidación de la ley por estimar "esencialmente correcta" la sentencia recurrida.

Dado a que el recurso interpuesto es una apelación, nos vemos precisados a resolver.

**II**

Debido a que la libertad de asociación actualmente es un derecho reconocido tanto en la esfera federal como en la estatal, daremos comienzo al marco legal relevante con el derecho estadounidense por este gozar de superior jerarquía.[3]

El esquema de revisión judicial a fin de considerar las violaciones a los *derechos fundamentales* está constituido de varios pasos. Primero, los foros judiciales deben apreciar si, en efecto, la persona posee, según sostiene, un derecho fundamental.[4] En caso de contestar en la afirmativa, la segunda condición requiere que se analice si el Estado infringió sustancialmente ese derecho. De ser así, el escrutinio estricto se activa y, por lo tanto, para que el acto o la regulación gubernamental se sostenga tendrán que examinar si este está justificado por un interés apremiante.

---

[2] Sentencia, *Índice del apéndice*, pág. 166.

[3] L. Muñiz Argüelles, *La investigación jurídica*, 5ta ed., Colombia, Temis, 2012, págs. 313-314.

[4] E. Chemerinsky, *Constitutional Law: principles and policies*, 5ta ed., Nueva York, Aspen Pubs., 2015, pág. 828.

De estarlo, entonces los juzgadores, como cuarto paso, tienen que ponderar si el medio empleado por el Estado es el menos oneroso.[5]

A fin de solventar la controversia que tenemos ante nuestra atención, procederé a fraccionar los pasos aludidos, según enumerados, y explicarlos con mayor detenimiento.

## A.

La Carta de Derechos de la Carta Magna de la Unión Americana no incorporó textualmente un derecho constitucional a la asociación.[6] Mas bien, fue la Corte Suprema de Estados Unidos la que se expresó sobre esta libertad en varios sentidos diferentes.[7] Es por ello que la naturaleza y el grado de protección que los tribunales han de brindarle a la libertad de asociación dependerá del aspecto de libertad que esté involucrado.[8]

La primera modalidad comprende las decisiones que los hombres y las mujeres tomamos de entrar y mantener ciertas relaciones humanas, las cuales deben ser salvaguardadas contra interferencias excesivas estatales pues tienen el rol de proteger su libertad individual, elemento central en el

---

[5] Íd.

[6] R. D. Rotunda, J. E. Nowark, *Treatise on Constitutional Law: Substance and Procedure*, 5ta ed., Minnesota, Thomson Reuters, 2012, Vol. 2, pág. 874; ("[T]he freedom of association has been found to be a fundamental value which is implied by the First Amendment guarantees even though it has no specific textual recognition in that amendment".).

[7] *Roberts v. US Jaycees*, 468 US 609, 617 (1984); ("Our decisions have referred to constitutionally protected 'freedom of association' in two distinct senses".).

[8] Íd., pág. 618.

esquema constitucional. [9] Para discernir qué tipo de asociación esta categoría abarca es trascendental examinar lo expuesto por el Juez Asociado Sr. William J. Brennan, lo cual citamos a continuación:

> The Court has long recognized that, because the Bill of Rights is designed to secure individual liberty, it must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State. […] Without precisely identifying every consideration that may underlie this type of constitutional protection, we have noted that certain kinds of personal bonds have played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs; they thereby foster diversity and act as critical buffers between the individual and the power of the State. […] Moreover, the constitutional shelter afforded such relationships reflects the realization that individuals draw much of their emotional enrichment from close ties with others. Protecting these relationships from unwarranted state interference therefore safeguards the ability independently to define one's identity that is central to any concept of liberty […].
>
> The personal affiliations that exemplify these considerations, and that therefore suggest some relevant limitations on the relationships that might be entitled to this sort of constitutional protection, are those that attend the creation and sustenance of a family—marriage, e.g., Zablocki v. Redhail, supra; childbirth, e.g., Carey v. Population Services International, supra; the raising and education of children, e.g., Smith v. Organization of Foster Families, supra; and cohabitation with one's relatives, e.g., Moore v. East Cleveland, supra. Family relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and

---

[9] Íd., págs. 617-618; ("In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme".).

beliefs but also distinctively personal aspects of one's life. Among other things, therefore, they are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship. As a general matter, **only relationships with these sorts of qualities are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element of personal liberty. Conversely, an association lacking these qualities —such as a large business enterprise— seems remote from the concerns giving rise to this constitutional protection.** (Énfasis suplido).[10]

Por otra parte, el Tribunal Supremo federal reconoció otra modalidad de libertad de asociación. En *NAACP v. Alabama ex rel. Patterson*, 357 US 449, 460 (1958), aceptó que la asociación expresiva era una libertad constitucional fundamental al pronunciarse como sigue: "freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of 'liberty' assured by the Due Process Clause of the Fourteen Amendment, which embraces freedom of speech".[11] Se trata, entonces, de un

---

[10] Íd., págs. 619-620.

[11] Sobre la diferencia entre las asociaciones mencionadas el profesor Jeb Rubenfeld explica que:

There are two constitutional rights of association. The first is the right of intimate association, which applies to decisions about whom to marry, to live with, to go to bed with, and so on. This right does not derive from the First Amendment. It is usually seen as a subspecies of the right of privacy, and it counts as unwritten from any perspective that recognizes the distinction between written and unwritten law. But the right of intimate association was not at issue in Boy Scouts; the Scouts were found to be much too large an organization to engage in "intimate" association. The associational right at issue in Boy Scouts was, instead, the right of "expressive association" -the right to associate for the purpose of engaging in expressive activity. This is the associational right associated with the First Amendment, even though it is not expressly enumerated therein. The New Unwritten Constitution, 51 Duke L.J. 289, 296 (2001).

reconocimiento del derecho de las personas para que puedan llevar a cabo las actividades protegidas por la Primera Enmienda, entre ellas, la libertad de expresión.[12] Esta vertiente se ha estimado crucial para prevenir que una mayoría imponga sus visiones a grupos que desean expresar otras ideas, incluso aquellas que no sean populares.[13] El raciocinio de la decisión es que la libertad de asociación es indispensable para preservar aquellas libertades incorporadas en la Primera Enmienda.[14] De hecho, el Máximo Foro de la Unión Americana ha hallado implícito en el derecho a llevar a cabo estas actividades la libertad a asociarse con el fin de perseguir una gama de objetivos como políticos, sociales, económicos, educacionales, religiosos y culturales.[15]

Por otro lado, y como es de esperarse, debido a las complejidades que caracterizan a las relaciones humanas, las disputas en torno a la libertad de asociación expresiva han

---

[12] *Roberts v. US Jaycees*, supra, págs. 618, 622; ("In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment —speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties.

.    .    .    .    .    .    .

An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed".).

[13] *Boy Scouts of America v. Dale*, 530 US 640, 647-648 (2000).

[14] Íd.

[15] *Roberts v. US Jaycees*, supra, pág. 622.

germinado en contextos variados.[16] A manera ilustrativa, el

académico Thomas Emerson describió las siguientes:

> The first is where a question is presented of the general power of the government to restrict or otherwise regulate the affairs of an organization or its membership. This was the problem involved in NAACP v. Alabama ex rel. Patterson. It comes up in many other situations, such as the Smith Act cases, the registration provisions of the Internal Security Act, and anti-trust cases, although the Supreme Court has not always attempted to deal with these matters in terms of a "right of association". **A second type of problem arises when governmental power is used to compel an individual to belong to an organization, pay dues, or otherwise participate in its activities.** (Énfasis suplido).[17]

En cuanto a ese segundo tipo, años atrás, en *Roberts v.*

*US Jaycees*, 468 US 609, 622 (1984), el Tribunal Supremo

federal aceptó expresamente que el derecho a la **no asociación**

—modalidad negativa de esta libertad— formaba parte de la

libertad constitucional protegida.[18]

Ahora bien, para dictaminar que un grupo está cobijado

por la libertad de asociación bajo la Primera Enmienda, es

menester determinar si el grupo constituye una asociación

---

[16] Íd., págs. 622-623; ("Among other things, government may seek to impose penalties or withhold benefits from individuals because of their membership in a disfavored group, e.g., Healy v. James, 408 U.S. 169, 180-184, 92 S.Ct. 2338, 2345-2347, 33 L.Ed.2d 266 (1972); it may attempt to require disclosure of the fact of membership in a group seeking anonymity, e.g., Brown v. Socialist Workers '74 Campaign Committee, supra, 459 U.S. 87, 91-92, 103 S.Ct. 416, 419-421, 74 L.Ed.2d 250 (1982); and it may try to interfere with the internal organization or affairs of the group, e.g., Cousins v. Wigoda, 419 U.S. 477, 487-488, 95 S.Ct. 541, 547, 42 L.Ed.2d 595 (1975)".).

[17] T. I. Emerson, *Freedom of association and freedom of expression*, 74 Yale L.J 1, 3-4, (1964).

[18] *Roberts v. US Jaycees*, 468 US 609, 622 (1984); ("Freedom of association therefore plainly presupposes a freedom not to associate".). En este caso el Tribunal Supremo de Estados Unidos validó un estatuto de acomodo social. Ello, a pesar de que implicaba que, al permitirle a las mujeres votar en la asociación, la libertad de asociación de los miembros masculinos se iba a ver afectada.

expresiva.[19] En otros términos, debemos justipreciar que la agrupación tome parte en alguna forma de expresión, sea pública o privada.[20]

De otro modo, en la esfera estatal desde el 1952 —previo al reconocimiento expreso del derecho a la libertad de asociación en Estados Unidos— el Art. II Sec. 6 de nuestra Constitución reconoce que "[l]as personas podrán asociarse y organizarse libremente para cualquier fin lícito, salvo en organizaciones militares o cuasi militares". En parte, esto respondió a una recomendación hecha por la Escuela de Administración Pública de la Universidad de Puerto Rico en un informe en el cual plasmó que

> [l]a libertad de actuar concertadamente plantea, sin embargo, difíciles problemas en cuanto a las relaciones de los individuos con las respectivas agrupaciones, las relaciones de estos grupos entre sí y las relaciones de todos con el gobierno. La historia de persecuciones de las minorías religiosas y de los sindicatos de trabajo es prueba dramática de los conflictos de intereses que están implícitos en la libertad de asociación.
>
> Es evidente que este derecho, como todos los demás, tiene que estar limitado para la protección de los individuos y la sociedad en general. Así debe ser en cuanto a grupos de todas clases —políticos, religiosos, económicos, obreros, etc. Pero el principio general de la libertad de asociación debe estar garantizado constitucionalmente, dejándose a la legislación ordinaria los ajustes necesarios para su aplicación adecuada.[21]

---

[19] *Boy Scouts of America v. Dale*, supra, pág. 648. Véase, además: R. D. Rotunda y J. E. Nowark, *Treatise on Constitutional Law: Substance and Procedure*, 5ta ed., Minnesota, Thomson Reuters, 2013, Vol. 6, pág. 416; ("To determine whether a group is protected, the Court must first determine whether it engages in 'expressive association'".).

[20] *Boy Scouts of America v. Dale*, supra, pág. 648.

[21] Escuela de Administración Pública, *La nueva constitución de Puerto Rico*, Río Piedras, Ed. U.P.R., 1954, pág. 225.

Consecuentemente, en el Diario de Sesiones de la Convención Constituyente se reconoció que

> [e]ste artículo da carácter constitucional al derecho de libre asociación y organización. En el desarrollo histórico de los derechos del hombre el énfasis durante los siglos XVIII y XIX recayó en los derechos individuales; de aquí que el derecho de asociación o de organización como tal no aparezca en las cartas constitucionales clásicas. A medida que gana complejidad la vida moderna se hace más patente la necesidad que tiene el individuo interesado en hacer pensar sus ideas o sus intereses en la concurrencia de ideas e intereses circundantes, de sumar fuerzas a las de otros individuos de igual inclinación y gestionar mancomunadamente lo que cada uno por cuenta propia difícilmente podría intentar.
>
> El derecho de asociación y de organización viene a ser uno de los instrumentos de más frecuente uso y de mayor utilidad en la práctica de los derechos individuales. La Comisión ha considerado propio reconocer constitucionalmente esta realidad, garantizando el derecho del individuo a asociarse para llevar a cabo en grupo cualquier actividad que habría podido realizar por separado. Claramente no cabe el derecho de asociación para hacer en grupo o mediante el grupo lo que está prohibido hacer al individuo. Por otra parte, hay muchas ocasiones donde la agrupación logra lo que no puede lograr el individuo. De ahí el gran número de agrupaciones de carácter obrero, vocacional, profesional, ideológico, cívico, creativo y cultural. Se han desarrollado nuevas maneras de concebir y resguardar los derechos de esos grupos así como los derechos y responsabilidades del poder público frente a estos grupos, colegios o sindicatos. El Estado retiene, desde luego, **su autoridad normalizadora frente a tales estructuras con arreglo a su responsabilidad básica de proteger los derechos de cada uno de sus ciudadanos, pertenezcan o no a los grupos en cuestión, salvaguardar los intereses de la comunidad en general** y retener en todo momento la autoridad legislativa. (Énfasis suplido).[22]

---

[22] 4 *Diario de Sesiones de la Convención Constituyente de Puerto Rico* 2565, Ed. 1961 (1952).

**B.**

Una vez comprobada la existencia de un derecho fundamental, el segundo paso nos requiere evaluar si en efecto se infringió. Claramente el Estado viola un derecho fundamental al impedir absolutamente su ejercicio.[23] Sin embargo, también puede transgredirlo cuando impone una carga en el ejercicio de tal derecho. Esta última circunstancia no supone cualquier traba. La casuística del Tribunal Supremo de Estados Unidos exige que la regulación o la actuación interfiera directa y sustancialmente.[24]

Cuando un tribunal concluye que el Estado perjudicó sustancialmente una garantía constitucional libertaria, el escrutinio estricto se activa.[25] En ese sentido, resultan pertinentes las palabras del profesor Richard H. Fallon, a saber: "[i]n cases involving freedom of association **and freedom not to be compelled to associate with speech**, the

---

[23] Chemerinsky, *op. cit.*, pág. 830.

[24] *Zablocki v. Redhail*, 434 US 374, 386-387 (1978); ("By reaffirming the fundamental character of the right to marry, we do not mean to suggest that every state regulation which relates in any way to the incidents of or prerequisites for marriage must be subjected to rigorous scrutiny. To the contrary, reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed. The statutory classification at issue here, however, clearly does interfere direct and substantially with the right to marry").

Íd. Véase, además, Chemerinsky, *op. cit.*, pág. 830; ("The Supreme Court has said that in evaluating whether there is a violation of a right it considers '[t]he directness and substantiality of the interference. But there has been surprisingly little discussion of what constitutes a direct and substantial interference with a right".).

[25] Rotunda, *op. cit.*, Vol. 2, pág. 848.

Court continued to hold that **substantial burdens triggered strict scrutiny**". (Énfasis suplido).[26]

La actuación gubernamental o ley que obstaculice la libertad asociación puede ser validada si sobrepasa el escrutinio estricto.[27] Este método adjudicativo posibilita que el gobierno lleve a cabo una actividad siempre que sea necesaria para adelantar un interés gubernamental apremiante.[28] Asimismo, fomenta que el Estado se cerciore de resguardar su interés apremiante a través de la promulgación de un estatuto "precisely tailored", entiéndase que sea la alternativa menos invasiva.[29]

Por otra parte, el escrutinio estricto conlleva varias repercusiones y obligaciones. Si bien nuestros precedentes las reconocen, la realidad es que, a pesar de su obvia trascendencia, al día de hoy no las hemos discutido exhaustivamente. Ello, incluso, aunque el escrutinio estricto ha sido objeto de discusión extensa por académicos estadounidenses.

---

[26] R. H. Fallon, *Strict Judicial Scrutiny*, 54 UCLA L. Rev. 1267, 1320 (2007).

[27] Para la historia y el desarrollo del escrutinio estricto, véase: Fallon, *supra*; "Only significant impariments of fundamental constitutional rights will be subject to strict judicial scrutiny, and be invalidated unless the government can demostrate that the restriction is narrowly tailored to a compelling or overriding government interest".). Rotunda, *op. cit.*, Vol. 2, pág. 848.

[28] Fallon, *supra,* pág. 1292; ("On the one hand, strict scrutiny avoided unworkably high-minded rigidity: When truly compelling interests were involved, the government could do what necessity dictated".).

[29] Íd; ("What is more, in invalidating statutes pursuant to the strict scrutiny formula, the Court could appear accommodating by holding out the possibility that if the government's interest were truly urgent, the government could protect it by writing a more precisely tailored statute".).

De entrada, el escrutinio estricto tiene el efecto de
invertir la carga probatoria. Sabido es que toda ley que no
perjudica sustancialmente un derecho fundamental, o no
contenga una clasificación sospechosa, se presume
constitucional.[30] Solo será invalidada si la parte que la
objeta acredita que no existe una relación racional entre la
ley o clasificación y el interés legítimo estatal.[31] En
cambio, según hemos pronunciado, una vez entra en vigor el
escrutinio estricto, el estatuto o la acción se presume
inconstitucional y se traslada al Gobierno el peso
evidenciario para que sea validada.[32] De forma ilustrativa,
el profesor Stephen A. Siegel explica, a fondo, la
repercusión probatoria que tiene el escrutinio estricto como
sigue:

> Shifting the burden of proof is an expression
> of strict scrutiny's assumption that in certain
> situations the judiciary should not accord the
> normal presumption of constitutionality to
> government action. The burden shifting aspect of
> strict scrutiny traces to Supreme Court's decision,
> in the late 1930s, to accord governmental action
> that burdened First Amendment liberties a reduced
> presumption of constitutionality. In 1958, the
> reduced presumption of constitutionality in First
> Amendment cases grew into full-fledged burden
> shifting. In that year, Justice Brennan decided
> Speiser v. Randall by shifting the burden of proof
> to the government and justified doing so on the

---

[30] Rotunda, *op. cit.*, Vol. 2, pág. 846; ("Laws that did not substantially impair a fundamental constitutional right, or employ a constitutionally suspect classification, would enjoy a presumption of constitutionality".).

[31] Rotunda, *op. cit.*, Vol. 2, pág. 846; ("Those law would not be invalidated unless the party attacking the law or classification could show that it had no possible rational relationship to any legitimate interest of government".).

[32] *Rodríguez Rodríguez v. ELA*, 130 DPR 562, 581 (1992); *Rodríguez Pagán v. Depto. Servicios Sociales*, 132 DPR 617, 635 (1993).

ground that, **when facts are unclear, properly protecting First Amendment rights requires imposing the cost of erroneous conclusions on the government.** (Énfasis suplido).[33]

No puede ser de otra manera. La transgresión sustancial por parte del Estado a un derecho fundamental no debe imponer a los ciudadanos y las ciudadanas las dificultades que, naturalmente, emanan de los procesos judiciales para que finalmente sea invalidada o sostenida de satisfacerse el escrutinio estricto.

Dicho esto, debo comentar lo que el gobierno ha de mostrar para que su actuación sea constitucionalmente sostenida.

## C.

Como mencionamos, solo admitiremos un acto o una regulación que interfiera sustancialmente con un derecho fundamental si sirve un interés gubernamental apremiante, no relacionado con la supresión de ideas, **y** ese interés no puede ser alcanzado a través de otros medios que sean menos restrictivos a la libertad de asociación.[34]

---

[33] S. A. Siegel, *The origin of the compelling state interest test and strict scrutiny*, 48 Am. J. Legal Hist. 355, 360 (2006).

[34] Íd., ("Infringements on that right may be justified by regulations adopted to serve compelling state interest, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms".).

Véase, además: Rotunda, *op. cit.*, Vol. 6, pág. 406, que explica lo siguiente:

> The Court has found that the right of associate for expressive activity is justifiably implied from the expressed First Amendment rights. This right cannot be limited by the government unless the limitation serves a compelling governmental interest unrelated to the suppression of ideas and this governmental interest cannot be furthered through means which are significantly less restrictive of the associational or expressive freedom. In

Así, el tercer paso consiste en determinar si el Estado tiene un **interés apremiante** que amerite la violación de un derecho fundamental.[35] Le corresponde al gobierno presentar el interés apremiante.[36] Esto es, **el Estado tiene que la carga probatoria de persuadir a los tribunales que el interés apremiante se cumple a través del estatuto o acto en cuestión**.[37]

**D.**

Que el gobierno posea un interés apremiante para quebrantar un derecho fundamental es indispensable **mas no suficiente**, por lo que limitar este análisis a solo este asunto para validar un acto gubernamental o una ley es, a todas luces, desacertado. Además de esto, reiteradamente tanto el Tribunal Supremo federal como este foro judicial, hemos dispuesto que resulta trascendental que acredite que la ley o actuación es la alternativa menos invasiva a ese

---

other words, the regulation of association must be narrowly tailored to promote an end that is unrelated to suppressing the message that will be advanced by the association and is unrelated to suppressing the association because government disapproval of its purposes.

[35] Para una explicación de la historia y el desarrollo del interés apremiante, véase: Siegel, *supra*; Harvard Law Review, *Let the end be legitimate: Questioning the value of heightened scrutiny's compelling – and important– interest inquiries*,129 Harv. L. Rev. 1406 (2016).

[36] *Rodríguez Rodríguez v. ELA*, supra, pág. 581; ("El Estado tiene la obligación de demostrar la existencia de un interés público apremiante".); Chemerinsky, *op. cit.*, pág. 831; ("If a right is deemed fundamental, the government must present a compelling interest to justify an infringement".).

[37] Chemerinsky, *op. cit.*, pág. 831; ("[T]he government has the burden of persuading the Court that a truly vital interest is served by the law in question".).

derecho. A esta parte de la revisión se le conoce como "narrow tailoring".[38]

Este esquema de revisión requiere que observemos si el Estado evidenció que el estatuto o acto es necesario, y por tanto, no podría hallar su interés a través de otros métodos que sean menos restrictivos a ese derecho.[39] En otras palabras, tiene que acreditar que ninguna otra alternativa, menos invasiva al derecho, funcionaria.[40] De modo que, una disposición legal no es necesaria para conseguir el propósito si el Estado puede llegar el mismo resultado ocasionando una carga menor sobre los derechos protegidos.[41] Además, en este punto, según se ha reconocido en la jurisdicción federal, la interferencia estatal a los derechos fundamentales no debe ser "underinclusive".[42] El profesor Fallon explica este factor de la forma siguiente: "[u]nderinclusive regulations 'diminish the credibility of

---

[38] Fallon, *supra*, pág. 1326.

[39] Chemerinsky, *op. cit.*, pág. 831; ("Under strict scrutiny is not enough for the government to prove a compelling purpose behind the law; the government also must show that the law is *necessary* to achieve the objective. This requires that the government prove that it could not attain the goal through any means less restrictive of the right".).

[40] Chemerinsky, *op. cit.*, pág. 831; ("The government's burden when there is an infringement of a fundamental right is to prove that no other alternative, less intrusive of the right, can work".).

[41] Fallon, *supra*.

[42] En *Church of the Lukimi Babalu Aye, Inc. v. City of Hialeah*, 508 US 520, 546-547 (1993), la Corte Suprema federal pronunció lo siguiente:

> When government restricts only conduct protected by the First Amendment and fails to enact feasible measures to restrict other conduct producing substantial harm or alleged harm of the same sort, the interest given in justification of the restriction is not compelling. It is established in our strict scrutiny jurisprudence that 'a law cannot be regarded as protecting an interest of the highest order … when it leaves appreciable damage to that supposedly vital interest unprohibited.

the government rationale' for infringing on constitutional rights and generate suspicion that the selective targeting betrays an impermissible motive".[43]

## III

Conforme al análisis enunciado, el derecho fundamental reclamado por los apelados es la libertad de asociación. Nos compete entonces pasar juicio respecto si a los técnicos automotrices se les impuso una carga en su libertad de asociarse libremente. En otras palabras, debemos indagar si, como arguyen, se les violentó este derecho al ser forzados a pertenecer al CTAPR. Veamos.

En el transcurso del pleito, reiteradamente, los apelados expresaron que no desean pertenecer al CTAPR. Argumentaron que la agrupación no les representa y, por ende, no se les puede forzar a estar en ella. Además, manifestaron que no desean ser partícipes de un grupo con el cual **difieren** de sus acciones y **expresiones** y no comparten intereses particulares. En ese sentido, apuntaron que el CTAPR era un agente de persecución contra cualquier objetor o disidente en la matrícula. Adujeron que la asociación no vela por sus intereses y que **tampoco se oponía a legislación que les resultaba perjudicial**. También, sostuvieron que las

---

[43] Fallon, *supra*, pág. 1327. Ahora bien, el profesor Fallon, tras analizar la casuística federal, advierte que tampoco puede ser "overinclusive". Íd., págs. 1328-1329. Véase, además: Harvard Law Review, *supra*, págs. 1417-1418; ("the Court's pronouncement of the state-interest question is ultimately a judgment on the fit between means and ends: a measure that sweeps more broadly than necessary in the name of convenience is simply inadequately tailored to its underlying goal".).

posturas oficiales de la agrupación no favorecían su desarrollo profesional.

Pertinente a estos planteamientos, resulta propio enfatizar que el estatuto objetado confiere al CTAPR **la representación de los colegiados** al prescribir que

> [e]l Colegio establecido por el presente capítulo **asumirá la representación de todos los colegiados y tendrá autoridad para hablar en su nombre y representación** de acuerdo con los términos de este capítulo y del reglamento que se aprobase y de las decisiones adoptadas por los colegiados en las asambleas anuales ordinarias y extraordinarias celebradas. (Énfasis y subrayado suplido).[44]

Como se puede apreciar, ciertamente, dado a que el Estado dispensó al apelante la facultad de **representar** a todos los y las mecánicos y técnicos automotrices, así como **hablar** por estos y estas, tenemos que concluir que este es un grupo involucrado en fines expresivos. Cuando la agrupación ejerce el poder concedido lleva un mensaje que un grupo de técnicos automotrices desaprueban. Por consiguiente, compelerlos a formar parte de una asociación involucrada en conducta expresiva, con la cual no coinciden, impone una carga sustancial en la modalidad negativa de la libertad de asociación que la Primera Enmienda garantiza a los apelados.

En consecuencia, entra en vigor el escrutinio estricto. Entonces, la ley se presume inconstitucional. El **gobierno** tiene el peso de acreditar que debe ser sostenida, mediante los requisitos que ese método de revisión provee. No obstante, aquí el Estado, sin más, desde el Tribunal de

---

[44] 21 LPRA sec. 2145(l).

Apelaciones se allanó al decreto de inconstitucionalidad del estatuto. Incluso, expresó estar conteste con este. A través de esta admisión, el gobierno abdicó su poder de razón de estado, la carga evidenciaría en el caso y aceptó el desenlace de este pleito. Es por esa razón que debe prevalecer el dictamen de la inconstitucionalidad de la ley. Así pues, es innecesario pronunciarnos más allá de esto. Mas aún cuando la disidencia, para validar la disposición legal, trae a colación factores o aspectos que no fueron argumentados ni expuestos en el caso. Ello nos convertiría en abogados del Estado.

## IV

Por las razones que preceden, estoy conforme con la opinión del Tribunal que decreta la inconstitucionalidad de la Ley Núm. 50 porque infringe la libertad de asociación protegida por la Primera Enmienda.

Edgardo Rivera García
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Abel Rodríguez Casillas y otros

    Apelados

       v.

Estado Libre Asociado de Puerto Rico, por conducto del Secretario de Justicia, Hon. César Miranda y otros

    Apelantes

AC-2017-0076    *Certiorari*

Opinión Disidente emitida por el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico a 8 de mayo de 2019.

Por considerar que las legislaciones que regulan ciertas profesiones y contemplan el requisito de colegiación compulsoria, en la mayoría de las ocasiones, adelantan unos intereses sociales de gran envergadura para el país, enérgicamente disentimos del curso de acción seguido en el presente caso por una mayoría de este Tribunal.

Al así hacerlo, resaltamos la importancia histórica que han tenido los colegios profesionales en el desarrollo de nuestra sociedad. Estas instituciones no sólo han defendido, y defienden, los intereses de los gremios que agrupan, sino también los de la ciudadanía en general.

De otra parte, los referidos colegios profesionales cumplen con la importante función de educar, tanto a la sociedad como a sus miembros, sobre los asuntos que atañen a su profesión. De igual forma, se aseguran de que quienes forman parte de su gremio mantengan sus conocimientos actualizados y cumplan con los requerimientos éticos que les rigen, protegiendo así a la ciudadanía de ser víctima de prácticas ilegales o un desempeño incompetente por parte de los profesionales a los que estas instituciones regulan.

En esa dirección, precisa señalar que "[e]l establecimiento de [colegios profesionales] no tiene por objeto principal la satisfacción de los intereses del profesional, ni aún los colectivos de la profesión, sino la del interés público que pueda suponer el ejercicio de determinada profesión". J. Gálvez Montes, *La organización de las profesiones tituladas*, 1ra ed., Madrid, Consejo de Estado, 2002, pág. 50. Ello responde a que, aunque la exigencia de una titulación funciona como garantía de que sólo ejerzan una profesión aquellos que hayan acreditado tener los conocimientos necesarios, existen ciertas profesiones en las cuales -- por sus características particulares -- no basta dicha garantía para proteger el interés público. *Íd*.

A estos efectos, comentaristas del tema han expresado que:

> [L]a obligatoriedad de la colegiación y su exclusividad no son efectos necesariamente

implicados por la naturaleza del Colegio Profesional. Son condicionantes relativos, que sólo están justificados en cuanto vengan impuestos por la relevancia del fin público que se persigue o bien por la imposibilidad o al menos dificultad de obtener ese fin sin recurrir a la adscripción forzada, esto es, si resulta necesaria para el cumplimiento de fines relevantes de interés general[…]. *Íd.* p. 147.

Así pues, si el propósito de los colegios profesionales es organizar el ejercicio profesional, no tiene sentido que su membresía sea de carácter voluntario. *Íd.*, pág. 290.

Cónsono con lo antes mencionado, y en lo relacionado al caso ante nuestra consideración, debemos recordar que el Colegio de Técnicos y Mecánicos Automotrices tiene como deberes:

(1) Contribuir al adelanto y desarrollo de la tecnología automotriz.

(2) Promover relaciones fraternales entre sus miembros.

(3) **Cooperar con todo aquello que sea de interés mutuo y de provecho al bienestar general.**

(4) Establecer relaciones con asociaciones análogas de otros países, dentro de determinadas reglas de solidaridad y cortesía.

(5) Mantener una moral saludable y estricta entre los asociados.

(6) **Elevar y mantener la dignidad del oficio y sus miembros, velar por que sus miembros observen una excelente conducta ética y establecer programas o cursos de educación o estudios continuos.**

(7) **Proveer el asesoramiento e información que requiera la gestión gubernamental.** (Énfasis suplido) Art. 12, Ley Núm. 50 de 30 de junio de 1986, 20 LPRA sec. 2145k.

De otra parte, el Colegio de Técnicos y Mecánicos Automotrices es la entidad encargada de adoptar los reglamentos y cánones de ética que rigen a los profesionales de la industria automotriz y velar por su cumplimiento. Asimismo, tiene la facultad de recibir e investigar las querellas formuladas respecto a la conducta de sus miembros. Por otro lado, además de disciplinar a sus miembros, cumple la importante función de protegerlos y socorrer a aquéllos que se retiren por inhabilidad física o edad avanzada, así como a los herederos de los que fallezcan, a través de un fondo beneficencia. Art. 3, Ley Núm. 50, *supra*, 20 LPRA sec. 2145b.

Lo anterior, a todas luces, redunda en beneficio de nuestro país y de todos los que aquí vivimos. De ahí la importancia del requisito de colegiación compulsoria en ciertas profesiones.

Como ha reiterado este Tribunal en múltiples ocasiones, el Estado, en particular la Asamblea Legislativa, tiene la responsabilidad de establecer medidas para proteger la salud, la seguridad y el bienestar de los ciudadanos, ello al amparo de su poder de razón de estado. *E.L.A. v. Northwestern Selecta*, 185 DPR 40 (2012); *Bomberos Unidos v. Cuerpo Bomberos*, 180 DPR 723 (2011); *Domínguez Castro v. E.L.A.*, 178 DPR 1 (2010); *Arenas Procesadas, Inc. v. E.L.A.*, 132 DPR 593 (1993). **Como parte de este poder, el Estado tiene la facultad de reglamentar el ejercicio de las**

**profesiones**. *Piovanetti v. S.L.G.Touma, S.L.G. Tirado*, 178 DPR 745 (2010); *Marcano v. Departamento Estado*, 163 DPR 778 (2005); *Román v. Trib. Exam. de Médicos*, 116 DPR 71, 77 (1985).

Si bien en nuestra Constitución está consagrado el derecho a la libre asociación -- del cual se deriva la vertiente negativa, es decir, el derecho a no asociarse --, el mismo no es absoluto. *P.N.P. v. De Castro Font II*, 172 DPR 883 (2007); *P. A. C. v. E. L. A.*, 150 DPR 359 (2000); *Democratic Party v. Tribunal Electoral*, 107 DPR 1 (1978). Como bien expresó este Tribunal, hace ya más de tres (3) décadas, en *Colegio de Abogados de P.R. v. Schneider* 112 DPR 540, 549 (1982), en dicha ocasión en el contexto de la colegiación compulsoria en la profesión legal:

> Los intereses públicos en la creación de una sociedad vigorosamente pluralista, en el mejoramiento de la abogacía y en la buena marcha del sistema judicial pesan decididamente más que las inconveniencias personales que pueda acarrear en ciertos casos la colegiación obligatoria. **El derecho a la no asociación, derivable del derecho contrario consagrado en la Constitución del Estado Libre Asociado, Art. II, Sec. 6, cede ante los intereses señalados, de naturaleza claramente imperiosa bajo la constitución puertorriqueña.** (Énfasis suplido).

Al extrapolar la normativa antes expuesta a los hechos ante nuestra consideración -- los cuales se recogen con particular precisión en la Opinión del Tribunal -- es forzoso concluir que, al aprobar la Ley Núm. 50, *supra*, el

Estado tenía -- y continúa teniendo -- un interés apremiante en el desarrollo de la profesión y el mejoramiento de los servicios ofrecidos al público, entre otros, que justificaba la reglamentación de los profesionales de la industria automotriz. Por tal razón, y en vista de la importante función que desempeña el Colegio de Técnicos y Mecánicos Automotrices, el derecho a no asociarse cede ante los intereses que adelanta la colegiación compulsoria.

Por último, cónsono con lo antes señalado, y toda vez que no tuvimos la oportunidad de formar parte del Tribunal que atendió ese caso, aprovechamos la ocasión para expresar nuestra profunda inconformidad con la norma establecida en *Rivera Schatz v. E.L.A y C. Abo. P.R. II*, 191 DPR 791 (2014), la cual hoy toma en consideración esta Curia para disponer de la causa de epígrafe. Ello, pues coincidimos con el criterio expresado por la entonces Jueza Presidenta de este Tribunal, Hon. Liana Fiol Matta, en su Opinión Disidente emitida en el referido caso -- a la que se unieron la hoy Jueza Presidenta Oronoz Rodríguez y la Juez Asociada señora Rodríguez Rodríguez -- en cuanto a que la colegiación compulsoria de los profesionales del derecho no es incompatible con nuestro poder inherente para reglamentar la profesión legal. Como bien se señala en dicha Opinión Disidente, hasta entonces, siempre habíamos reconocido la legislación relacionada a la colegiación

compulsoria como complementaria a nuestra función reglamentadora.

De otra parte, y conforme a lo ya discutido, el Estado tiene intereses apremiantes en reglamentar la abogacía, los cuales superan las inconveniencias personales de la colegiación compulsoria. **Esta medida -- refiriéndonos a la colegiación compulsoria de los abogados y abogadas del país -- no sólo era provechosa para el mejoramiento de la abogacía y los servicios que esta ofrece a la población, sino que también adelantaba el interés de propiciar una profesión unificada y "la existencia de un espacio de discusión y debate inclusivo, representativo y democrático, en el cual la comunidad legal, en un marco de respeto, pueda armonizar sus diferencias para beneficio del Derecho Puertorriqueño"**. *Rivera Schatz v. E.L.A y C. Abo. P.R. II*, *supra*, pág. 871 (Op. disidente, Jueza Presidenta Fiol Matta). Igual sucede, aunque de otro contexto, con la colegiación compulsoria de los y las profesionales de la industria automotriz.

Es, pues, por todo lo anterior que enérgicamente disentimos del curso de acción seguido por una mayoría de este Tribunal en el día de hoy.


                                        Ángel Colón Pérez
                                        Juez Asociado